BERTHA MEISSNER, as Administratrix, etc., of HUGO MEISS-
NER, Deceased, Respondent, v. ATLANTIC HYGIENIC ICE
COMPANY, Appellant.

Second Department, May 11, 1917.

**Master and servant — negligence — death of machinist in ice-making
plant — evidence not justifying recovery.**

Action brought under the Employers' Liability Act to recover for the death
of a person employed as machinist and repairman in an ice-making plant.
The decedent who had undertaken to make repairs to certain machinery
was found on the following day dead and frozen at the bottom of an
elevator shaft. There was evidence that some of his bones were broken
and that there were internal injuries. Evidence examined, and *held*,
insufficient to support a verdict for the plaintiff and that a new trial
should be granted.

MILLS and RICH, JJ., dissented.

REARGUMENT of an appeal by the defendant, Atlantic
Hygienic Ice Company, from a judgment of the Supreme
Court in favor of the plaintiff, entered in the office of the
clerk of the county of Queens on the 4th day of March,
1916, upon the verdict of a jury for $5,500, and also from an
order entered in said clerk's office on the 14th day of February,
1916, denying defendant's motion for a new trial made upon
the minutes. (See 176 App. Div. 934.)

The action was brought under the Employers' Liability
Act (Labor Law [Consol. Laws, chap. 31; Laws of 1909,
chap. 36], art. 14, as amd. by Laws of 1910, chap. 352) to
recover damages for the death of Hugo Meissner, plaintiff's
husband, who had been employed at the defendant's ice-
making plant, at the corner of Atlantic and Rochester avenues,
in the borough of Brooklyn.

Plaintiff's testimony was that her husband, the decedent,
was aged twenty-eight years and was quite a tall man.

About eight A. M. of July 17, 1913, the body of plaintiff's
husband was found frozen at the bottom of the elevator
shaft in the defendant's ice storeroom. Ice in cakes is passed
into this storage room through an opening from the anteroom.
It is tiered up at different heights, to which the cakes are raised
by a lift or " gig " operated by compressed air. The cakes
of ice are placed on this " gig " and then raised to the height

where they can be slid out upon the upper tiers. There is a shifter rope operated by hand, by which the " gig " is raised or lowered like a dumb waiter.

Decedent was a machinist and repair man at the defendant's plant, and had been employed there for eight months. The previous afternoon, deceased had been informed that this shifter, or operating rope, had parted. Although he was told that he could defer making repairs till the following morning, deceased started on this errand, saying it would take but fifteen minutes. This was the last seen of him alive. This storage room is kept at a temperature of about twenty-six degrees. At this time it held seven or eight tiers of ice, rising to a height of over twenty feet.

The gig is made to take edgewise a cake of ice measuring eleven by twenty-two by forty inches. Its shaft has three sides closed, the front being boarded up to hold back the rising ice tiers. No one else, apparently, entered the storeroom that night. That elevator was not run in the night time. In the morning, the elevator was found in position about twenty feet high, abreast of the top of the ice. Deceased's body was at the bottom of the pit or shaft, in a reclining position, one leg being across a permanent beam or bunker placed there to stop the gig from descending below the floor level. Deceased's face was turned toward the opening leading out to the anteroom. His body and legs were frozen stiff. There is doubt whether this rigidity extended to his neck. Considerable difficulty occurred in getting out the body through the wall opening, which was only a foot wide and two feet high. By use of crowbars breaking some of the side boarding, making space to have the body in the line for the opening, it was turned on the side and passed out into the anteroom. It had also forcible handling to place it in the box for the morgue. One of the witnesses noticed a red streak or wrinkle on the abdomen; and Mrs. Meissner described a dark mark leading from the neck to the jaw. The surgeon, however, at the autopsy, testified that he noticed no mark of external violence on the head or on the body. He found the sixth, seventh and eighth ribs broken; the spine below the dorsal region fractured. The liver had also been ruptured, with a hemorrhage, partly clotted, into the abdominal cavity.

In view of the possibility of injuries to the body during its removal, the surgeon was asked as to the possibility of the fractures having been of a *post mortem* origin. He admitted that the fractures could have been so caused, but was unable to state if the ruptured liver and hemorrhage arose after death.

After discovery of this casualty, the chief engineer went up on the roof of the anteroom building, where the shifter rope led, and placed a clamp on the broken ends. He then examined other parts of the hoisting machinery, which he found in good order; at about eleven o'clock the elevator was again running without other repair than reconnecting this shifter rope.

An expert who had formerly worked at this plant, and had knowledge of other ice lifts, gave an opinion that, if the air compressors should be stopped (which occurred every afternoon between the day and the night shifts), the air supply in the cylinder might leak out through worn packing to an extent to let the gig descend, although he had never seen such a thing occur. One of defendant's former employees said he knew of this " gig " coming down apparently of itself, but the possibility of some one handling the shifter rope at that time, either above or under the point of the witness' observation, was not negatived. Against this, defendant's president and chief engineer testified that they had never known of the gig coming down of itself during the four years it had been in operation. An engineer in the firm who built this apparatus testified as to its construction. Air reduced to a pressure of 600 pounds is admitted by valves into a single cylinder, which operates the hoisting cables. There is also a reservoir of compressed air about three feet in diameter and six feet high, which holds from 125 to 150 gallons. Assuming a possible leakage in the packing, it must necessarily lower the gig very gradually. As the gearing is four to one, the gig's actual weight of 160 pounds would represent only forty pounds load upon the piston, which could not overcome the weight and inertia of the piston, piston rod, and the friction of the stuffing box. To start the gig down would, therefore, take a long time, and still longer for it to make the twenty feet descent. This testimony was not the subject of cross-examination. At the close of the proofs,

defendant's counsel repeated his motion to dismiss, on the ground that no negligence by defendant had been established, and that deceased had been shown guilty of contributory negligence, which the court denied.

The jury, however, were instructed that there was no proof of any defect at all in the machinery, including the compressor and its appliances, and no proof of escape of air, or that such a condition existed, or of any actual air leakage at any time. The learned court also charged that there was no omission or failure of duty to inspect. The jury's verdict was for $5,500 damages. Defendant's counsel moved to set it aside, which the court denied.

*James J. Mahoney* [*George J. Stacy* with him on the brief], for the appellant.

*James I. Cuff*, for the respondent.

PUTNAM, J.:

The theory that through pneumatic leaks this gig fell and fatally injured the decedent is opposed to the uncontradicted fact that the next morning, when the body was first discovered, the gig was in its place alongside the upper tier of ice, in good order. This shaft being to raise a cake of ice edgewise, left little room for a man at the bottom to move from an upright position. The gig carried the ice on iron strips. Had such an object delivered the fatal blow, this tall man, in such a narrow shaft, would hardly have room to bend over and take the blow below the dorsal vertebrae. On the other hand, if deceased had slipped from the ice above, and fallen, feet first, down this shaft, the upright beam or bunker at the foot might have made such a contact and internal injury as the surgeon found. The duty to repair this shifter rope required Meissner to go to the break in the line above, and did not call him to the foot of this shaft. The suggestion of the gig falling, through air leakage above, was a hypothesis, which failed to explain and reconcile such facts as the normal position in which the gig was found, with no indications of air escape, and all operating parts in shape to resume running with no other repair than reconnecting this shifter line. There being no proof of defects, and no

omission by defendant to inspect, if this gig in some mysterious way did cause this injury, still that would not establish actionable negligence. In the absence of defects or of traces of air leakage, or other indication of some neglect, the verdict should not stand.

I advise that the judgment and order be reversed, and a new trial granted, costs to abide the event.

JENKS, P. J., and BLACKMAR, J., concurred; MILLS and RICH, JJ., dissented.

Judgment and order reversed on reargument, and new trial granted, costs to abide the event.